V–1 OIL COMPANY, an Idaho corporation, on behalf of itself and all others similarly situated; and Harding Mechanical, Inc., a Utah corporation, and Robert G. Harding, an individual, on behalf of themselves and all others similarly situated, Plaintiffs and Appellants,

v.

UTAH STATE TAX COMMISSION and Utah State Department of Environmental Quality, Defendants and Appellees.

No. 950156.

Supreme Court of Utah.

Oct. 29, 1996.

Opinion on Rehearing Aug. 5, 1997.

Peter Stirba, Benson L. Hathaway, Linette B. Hutton, Salt Lake City, for plaintiffs and appellants.

Jan Graham, Atty. Gen., Melissa M. Hubbell, Clark L. Snelson, Asst. Attys. Gen., Salt Lake City, for defendants and appellees.

ZIMMERMAN, Chief Justice:

V–1 Oil Company ("V–1"), a distributor of gasoline and other motor fuels, appeals from the district court's dismissal of its claim that Utah's one-half cent environmental "surcharge" on motor vehicle fuels delivered to underground storage tanks ("USTs") is, in reality, a tax and, as such, violates article XIII, section 13 of the Utah Constitution's ban on the expenditure of any motor fuel tax for nonhighway purposes. We find the surcharge in question to be a tax and its use to contravene article XIII, section 13. We reverse the district court and remand for further proceedings in conformance with this opinion.

We treat the trial court's dismissal of V–1's claim as a grant of summary judgment in favor of the Utah State Tax Commission ("Commission") and the Utah State Department of Environmental Quality ("Department") (collectively, the "State").[1] Accord-

---

1. Although the State did not technically file a cross-motion for summary judgment, it opposed V–1's claim on the merits in a motion to dismiss. Given the trial court's ruling and the fact that both parties submitted affidavits and other evidence in support of their respective motions, we treat the court's ruling as a sua sponte grant of summary judgment for the State. *See, e.g., Warren v. Provo City Corp.*, 838 P.2d 1125, 1127 n. 2 (Utah 1992).

ingly, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to V–1, the party against whom the summary judgment was granted. *See Harline v. Barker,* 912 P.2d 433, 435 (Utah 1996).

In 1989, the Utah legislature enacted the Underground Storage Tank Act (the "Act"). Ch. 268, §§ 2–28, 1989 Utah Laws 843, 844–52. The Act established an annual underground storage tank registration fee, *id.* § 10 (currently codified as Utah Code Ann. § 19–6–408),[2] and a petroleum storage tank fee, *id.* § 12 (currently codified as Utah Code Ann. § 19–6–411).[3] In 1990, the legislature amended the Act to include the environmental surcharge on petroleum products that is at issue in this case. Ch. 301, § 3, 1990 Utah Laws 1423, 1424–25 (currently codified as Utah Code Ann. § 19–6–410). The one-half cent per gallon environmental surcharge "is imposed on all petroleum that is sold, used, or received for sale or use in this state" and delivered to an underground storage tank or held for subsequent retail sale, unless otherwise exempt. Utah Code Ann. § 19–6–410(1), (2). As implemented, the surcharge is collected on the first sale or use of petroleum products in Utah, and it is undisputed that the surcharge is levied in a manner identical to the collection of the Utah excise tax on motor fuels, i.e., on a per-gallon basis. The Commission is responsible for prescribing the method of payment and enforcing the surcharge, and the penalties for failing to pay the surcharge "are the same as the penalties for failure to pay a tax as specified in Sections 59–1–401 and 59–1–402." *Id.* § 19–6–410(4), (5). In addition, the Commission may revoke the license of any petroleum distributor who is delinquent in payment of the surcharge. *Id.* § 19–6–410(5).

As currently written, the Act requires that the revenues from installation company permit fees, petroleum tank storage fees, and the environmental surcharge be deposited into the Petroleum Tank Storage Fund (the "Fund"). *Id.* § 19–6–409(1). The major purpose of the Fund is to help UST owners and operators meet federal financial responsibility requirements. To explain: The Environmental Protection Agency ("EPA") requires UST owners and operators to demonstrate minimum financial capability for taking corrective action and for compensating third parties for bodily injury and property damage caused by accidental releases arising from the operation of petroleum USTs. 40 C.F.R. § 280.93. Owners and operators of more than 100 USTs must document that they can financially assure $2,000,000 annually for these purposes, while owners and operators of 100 or fewer USTs must assure $1,000,000 annually.[4] *Id.* Under EPA rules, owners and operators may demonstrate their financial responsibility in a number of ways: insurance or risk retention group coverage, a surety bond, a guarantee, a letter of credit, self-insurance, a trust fund, a state-required mechanism, or a state fund or other state assurance program. *Id.* §§ 280.94 to 280.103. However, in its preamble to the rule, the EPA noted that some of these mechanisms were likely to be affordable to only a few owners and operators and that Congress had "specifically recognized the important role that state funds may play in providing financial assurance." 53 Fed.Reg. 43,325 (1988).

Utah's Fund provides a mechanism for UST owners and operators to demonstrate that they meet EPA financial responsibility requirements. After a deductible of $10,-

---

**2.** The Department establishes the amount of the registration fee in accordance with Utah Code Ann. § 63–38–3.2. *See* Utah Code Ann. § 19–6–408.

**3.** The current annual storage tank fee ranges from $50 to $150 per tank, depending on the annual throughput rate of petroleum at each facility. *See* Utah Code Ann. § 19–6–411. In addition, each storage tank installation company must pay an annual permit fee ranging from $2,000 to $4,000, depending on the number of

tanks installed during the year, and a $200 fee for each tank installed. *Id.*

**4.** The EPA also imposes per-occurrence assurance requirements. Owners and operators of USTs that are located at petroleum marketing facilities or that handle more than 10,000 gallons of petroleum per month on an annual basis must assure $1,000,000, while all other UST owners and operators must assure $500,000. 40 C.F.R. § 280.93.

000,[5] the Fund pays up to $1,000,000 per release for a large owner or operator, not to exceed $2,000,000 annually if there are multiple releases, or up to $500,000 per release for a smaller owner or operator, not to exceed $1,000,000 annually.[6]  Utah Code Ann. § 19–6–419.  These annual payment amounts are identical to the financial assurance amounts required by the EPA.  Thus, by citing their participation in the Fund, UST owners and operators in Utah can demonstrate compliance with EPA financial responsibility requirements.  Although the record is not entirely clear as to the reason, it is undisputed that V–1 meets federal responsibility requirements without relying on the Fund and does not participate in the Fund.[7]

In March of 1994, V–1 filed a complaint against the State for declaratory and injunctive relief on behalf of itself and all others similarly situated.  In its first claim, V–1 sought to have section 19–6–410[8] of the Utah Code, which establishes the surcharge, declared violative of article XIII, section 13[9] of the Utah Constitution, which restricts spending of motor vehicle fuel "excise taxes"[10] to highway purposes.  V–1 claimed that the statute is unconstitutional because (i) the surcharge is an excise tax and (ii) it directs that the revenues from the surcharge be deposited into and spent from the Fund for nonhighway purposes.  See Utah Code Ann. § 19–6–409 (establishing the Fund and specifying expenditures from it).  V–1 also requested a refund of all monies unconstitutionally assessed, as well as attorney fees.  V–1 styled its second and third claims as class action claims in which it sought a refund on behalf of the class and a permanent injunction prohibiting the collection, enforcement, appropriation, and expenditure of monies pursuant to the surcharge.

In response, the State moved to dismiss V–1's complaint insofar as it purported to rep-

5.  The original deductible of $10,000 was raised in a 1991 amendment to $25,000 if the release occurred after July 1, 1996.  Ch. 252, § 1, 1991 Utah Laws 980.  However, a 1996 amendment deleted all references to the $25,000 deductible and the July 1, 1996, date.  Ch. 79, § 28, 1996 Utah Laws.

6.  When a release occurs, the responsible party must pay the first $10,000 of costs associated with the release.  The Fund will pay the next $990,000 of costs if the release was from a tank located at a facility engaged in petroleum production, refining, or marketing or if the tank had an average monthly throughput of more than 10,000 gallons of petroleum.  If neither of these latter conditions exists, then the Fund will pay the next $490,000 of costs.  The responsible party must pay all costs per occurrence that exceed these limits.  Utah Code Ann. § 19–6–419.

7.  The record indicates that V–1 does not benefit from the Fund because it is self-insured.  However, the record also indicates that V–1 may not qualify for coverage from the Fund because it has failed to clean up some contamination.

8.  Section 19–6–410 provides:

(1) An environmental surcharge of one-half cent per gallon is imposed on all petroleum that is sold, used, or received for sale in this state, except under Subsection (2).
(2) The environmental surcharge is not imposed on petroleum delivered to any tank that is:
(a) not an underground storage tank, unless the petroleum is being held for subsequent retail sale; or

(b) exempt from this part, unless the tank becomes eligible for payments from the Petroleum Storage Tank Fund.
(3) The revenues generated by the environmental surcharge and any penalties for failure to pay the environmental surcharge shall be deposited in the Petroleum Tank Storage Fund.
(4) The State Tax Commission:  .
(a) shall prescribe by rule the method of payment of the environmental surcharge; and
(b) is responsible for the enforcement of this section.
(5)(a) The penalties and interest for failure to pay the environmental surcharge are the same as the penalties and interest for failure to pay a tax as specified in Sections 59–1–401 and 59–1–402.
(b) The State Tax Commission may also revoke any license issued by the commission to distribute petroleum if the distributor is delinquent in payment of the environmental surcharge.
Utah Code Ann. § 19–6–410.

9.  The Utah Constitution provides:

[T]he proceeds from the imposition of any excise tax on gasoline or other liquid motor fuels used for propelling such vehicle ... shall be used exclusively for highway purposes....
Utah Const. art. XIII, § 13.

10.  An "excise tax" is a tax "on the manufacture, sale, or use of goods or on the carrying on of an occupation or activity, or a tax on the transfer of property."  Black's Law Dictionary 563 (6th ed. 1990).

resent a class and to dismiss Robert G. Harding and Harding Mechanical, Inc., on the ground that they lacked standing because they were petroleum consumers who did not pay the surcharge. V–1 then moved for summary judgment on the merits of its constitutional claim, and the State filed a second motion to dismiss V–1's claim.[11] After oral argument on the motions, the district court ruled that the surcharge was a fee because Fund monies are used entirely for the purpose of dealing with problems associated with storage of petroleum products, not to defray general government expenses. The court found that the statutory scheme "merely provides a service to the owners of those tanks in the nature of an insurance policy." The court also noted that excess revenues contained in the Fund may be needed to pay for future catastrophic losses. As a result of its determination that the surcharge was a fee, the court did not reach the constitutional issue and dismissed all of V–1's claims with prejudice. V–1 appeals the district court's decision on the merits.[12]

■ Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Utah R.Civ.P. 56(c); *CIG Exploration, Inc. v. Utah State Tax Com'n*, 897 P.2d 1214, 1215 (Utah 1995). " '[A] challenge to summary judgment presents only a question of law, which we review for correctness.' " *CIG Exploration*, 897 P.2d at 1215 (quoting *West v. Thomson Newspapers*, 872 P.2d 999, 1004 (Utah 1994)). In addition, "[t]he party attacking the constitutionality of a statute has the burden of affirmatively demonstrating that the statute is unconstitutional." *Kennecott Corp. v. Utah State Tax Comm'n*, 858 P.2d 1381, 1384 (Utah 1993).

The issues to be resolved on this appeal are (i) whether V–1 has standing to challenge the surcharge as an unconstitutional tax, (ii) whether the surcharge is a tax, (iii) if it is a tax, whether it is unconstitutional, and (iv) if it is an unconstitutional tax, the remedy available for the constitutional violation. We address these issues in order.

■ We first address the issue of whether V–1 has standing to litigate its constitutional claim. Although the State raised the standing issue for the first time on appeal, that does not preclude our ruling on the point. "Standing is an issue that a court can raise *sua sponte* at any time." *State v. Tuttle*, 780 P.2d 1203, 1207 (Utah 1989). The State claims that V–1 lacks standing because it is not sufficiently injured by the imposition of the surcharge. Essentially, the State reasons that (i) it is undisputed that a petroleum tax is constitutional; (ii) therefore, V–1 can legitimately complain only of the use to which the revenues are put, i.e., nonhighway purposes; and (iii) any such unconstitutional expenditures create no particularized harm to V–1 sufficient to give it standing.

We do not agree. We have liberally allowed taxpayers to challenge allegedly illegal or unconstitutional expenditures. In *Jenkins v. Swan*, we said that we have "long held that a taxpayer has standing to prosecute an action against municipalities and other political subdivisions of the state for illegal expenditures.... We have also extended the taxpayer's right to sue concerning illegal use of public monies to include an action against the state." 675 P.2d 1145, 1153 (Utah 1983) (citing *Lyon v. Bateman*, 119 Utah 434, 228 P.2d 818 (1951)). A plaintiff in such cases need only meet our standing requirements.

Under *Jenkins v. Swan* and its progeny, a party seeking standing must demonstrate only one of the following:

(i) a personal stake in the controversy and some causal relationship between the injury, the governmental actions, and the relief requested; (ii) that no other party has a

---

11. In its second motion to dismiss, the State also contended that V–1 had failed to exhaust its administrative remedies and to comply with the notice requirements of the Governmental Immunity Act. The district court denied these aspects of the motion. The State does not raise these issues on appeal, and we therefore do not consider them in this opinion.

12. Because V–1 does not appeal the district court's dismissal of Robert G. Harding and Harding Mechanical, Inc., or V–1's claims on behalf of the asserted class, we do not reach these issues.

greater interest in the outcome of the case and the issues are unlikely to be raised at all unless the present party has standing to raise them; or (iii) that the issues are of such great public importance that they ought to be decided in furtherance of the public interest.

*Archer v. Board of State Lands & Forestry,* 907 P.2d 1142, 1145 (Utah 1995) (citing *Jenkins,* 675 P.2d at 1150–51).

Applying the *Jenkins* test here, we conclude that V–1 satisfies the first step of the three-part test and is to be awarded standing without further inquiry. V–1 pays the environmental surcharge, which increases V–1's tax burden. This is the causal relationship we spoke of in *Jenkins.* 675 P.2d at 1153. If we were to declare the surcharge unconstitutional, the adverse impact of the higher tax on V–1 would be relieved. *See id.* Therefore, V–1 has standing to make its constitutional challenge.

■ We next address whether the district court correctly ruled that the environmental surcharge established in section 19–6–410 of the Code is a "fee" as opposed to a tax. Our cases do not establish a bright line test for distinguishing a tax from a fee. Rather, "[h]ow such exactions should be classified depends upon their purpose." *Weber Basin Home Builders Ass'n v. Roy City,* 26 Utah 2d 215, 487 P.2d 866, 867 (1971). Generally speaking, a tax raises revenue for general governmental purposes, while a fee raises revenue either to compensate the government for the provision of a specific service or benefit to the one paying the fee or to defray the government's costs of regulating and policing a business or activity engaged in by the one paying the fee. *Id.; see also Ponderosa One v. Salt Lake City Suburban Sanitary Dist.,* 738 P.2d 635, 636 (Utah 1987); *Utah Restaurant Ass'n v. Davis County Bd. of Health,* 709 P.2d 1159, 1164 (Utah 1985); *Consolidation Coal Co. v. Emery County,* 702 P.2d 121, 123 (Utah 1985). These cases, however, fail to delineate clearly the distinction between a tax and a fee. *Black's Law Dictionary,* also failing to set forth a clear

distinction, states that the objective of a tax is "to generate revenue to be used for the needs of the public," while a fee is "[a] charge fixed by law for services of public officers or for use of a privilege under control of government." *Black's Law Dictionary* 1457, 614 (6th ed. 1990).

We can say, however, that these definitions of "fee," as distinguished from "tax," suggest that there are at least two broad types of fees: (i) a fee for service, i.e., a specific charge in return for a specific benefit to the one paying the fee, and (ii) a regulatory fee, i.e., a specific charge which defrays the government's cost of regulating and monitoring the class of entities paying the fee. We analyze the surcharge under both concepts to determine whether it can be fairly characterized as a legitimate fee under either concept. If it cannot, then it is a general revenue-raising measure and must be classified as a tax.

■ We first address whether the environmental surcharge can qualify as a fee for the insurance service the State provides. To be a legitimate fee for service, the amount charged must bear a reasonable relationship to the services provided, the benefits received, or a need created by those who must actually pay the fee. This requirement is intended to prevent a fee from being used to generate excessive revenues and becoming indistinguishable from a tax.[13] *See Banberry,* 631 P.2d at 902. More specifically, for a fee for service to be reasonable, the total cost of the service so financed must fall equitably upon those who are similarly situated and in a just proportion to the benefits conferred. *Id.* at 903. We do not insist on exact mathematical precision, however, in holding that a certain charge is a legitimate fee instead of a tax. The revenues raised by the fee may exceed the precise cost of providing the service to those paying the fee, yet the fee may be reasonable as long as its reasonableness can be determined in some other manner. *Walker v. Brigham City,* 856 P.2d 347, 349–51 (Utah 1993). The nature of the service or benefit provided may also make it difficult or

---

**13.** This issue has most frequently arisen when municipalities that lack the power to tax impose a fee which is then challenged as an unconstitu-

tional tax. *See, e.g., Banberry Dev. Corp. v. South Jordan City,* 631 P.2d 899, 902 (Utah 1981).

impossible to distribute the services or benefits equally to all who pay the fee. *Banberry*, 631 P.2d at 905. For such a fee to be reasonable, we have directed that it should be fixed so as to be equitable in light of the relative benefits conferred as well as the relative burdens imposed. *Id.* Thus, if the fee bears no reasonable relationship to some need created by the one paying the fee, *Call v. City of West Jordan*, 614 P.2d 1257, 1259 (Utah 1980), or if the services provided through the fee are not of "demonstrable benefit" to the one paying the fee, *Banberry*, 631 P.2d at 905, then the fee is likely to be unreasonable and, hence, illegitimate.

We conclude that the environmental surcharge cannot be characterized as a legitimate fee for service under this test. First, the State concedes that V–1 independently meets federal financial responsibility requirements without reliance on the Fund. Second, and most important, the State concedes that although V–1 must pay the surcharge, a release from one of V–1's tanks would not be paid for by the Fund. Finally, the State concedes that V–1 gets no other benefit from the Fund's existence.[14]

■■■ Having found that the surcharge is not a legitimate fee for service because V–1 gets no benefit from it, we next analyze whether the surcharge qualifies as a legitimate regulatory fee. Like all fees, a regulatory fee must bear some reasonable relationship to the cost of the thing said to justify its imposition, in this instance, the costs of regulating the industry that pays the surcharge. *Utah Restaurant Ass'n*, 709 P.2d at 1164; *Consolidation Coal*, 702 P.2d at 127; *Mountain States Tel. & Tel. Co. v. Salt Lake County*, 702 P.2d 113, 117–18 (Utah 1985); *Weber Basin Home Builders*, 487 P.2d at 867.

Here, the question is whether the environmental surcharge is used to defray the costs of regulation and, if so, whether the surcharge bears a reasonable relationship to the cost of regulating the UST industry. In undertaking this analysis, we must distinguish the surcharge from the other fees levied under the Act, specifically, the Act's tank registration and tank storage fees. Under the statutory scheme, the tank registration fee, levied on each facility with USTs, is earmarked for the Department to administer the underground storage tank program and the petroleum storage tank program and, through the Solid and Hazardous Waste Control Board, to regulate underground storage tanks and petroleum storage tanks. Utah Code Ann. § 19–6–408; *see also id.* §§ 19–6–103, –106, –403, –404. Similarly, the tank storage fee, which is fixed at $50 to $250 per tank per year, is deposited in the Fund and must be paid as a condition of receiving a certificate of compliance indicating that an owner's or operator's tanks meet a "tank tightness test." *Id.* §§ 19–6–411, –412, –413. These programs are applicable to the entire UST industry, and the State concedes that the revenues generated by these fees are generally sufficient to cover the administrative costs of the UST Act. These fees are classic regulatory fees and appear entirely legitimate.

We next address the environmental surcharge. Monies from the surcharge are deposited into the Fund and may be used to pay certain costs, which can be categorized into four types: (i) investigation, abatement, and correction of releases, and judgments, awards, and settlements for bodily injury and property damage to third parties; (ii) legal and claims-adjusting costs incurred by the State in connection with such third-party claims; (iii) expenses of the state risk manager in ensuring the actuarial soundness of the Fund; and (iv) administration of the Fund and the environmental surcharge. *Id.* §§ 19–6–402(9), –409.[15]

The first category of costs paid for by the Fund is, in reality, the insurance service that

---

**14.** Accordingly, the issue of whether some indirect benefit might suffice to validate a fee for service in some other context is not before us today.

**15.** In addition, the legislature may appropriate Fund monies in excess of $18,000,000 for the purposes of the Petroleum Storage Tank Loan Fund, *see* Utah Code Ann. § 19–6–405.3, and for investigation, abatement, and corrective action regarding releases not covered by the Fund and not listed on the national priority list of hazardous waste sites. *Id.* § 19–6–409(5).

the State has elected to provide to UST owners and operators to help them meet the EPA's financial responsibility requirements. Indeed, the State admits that wholly apart from the Fund's existence, UST owners and operators are legally obligated to remediate a release from their tanks. *See* Utah Code Ann. § 19–6–426; *see also id.* § 19–6–424.5. And as noted above, the Fund will not pay to remediate a release from tanks owned by some who are self-insured but who must pay the fee, such as V–1. Therefore, we do not think such costs can be fairly characterized as "necessary to (and therefore proportionate to the cost of) regulation of the licensed entities." *Consolidation Coal,* 702 P.2d at 127. Similarly, the second and third categories of costs are incurred by the State only in connection with the insurance service it has elected to provide, and the fourth category of costs is for administering the first three and the surcharge itself.

We therefore conclude that Fund monies generated by the surcharge are dedicated to providing services to a segment of the UST industry, not to regulating it. Consequently, the surcharge cannot fairly be characterized as a regulatory fee. Because we determine that the surcharge cannot be validly characterized as a regulatory fee, we need not address the second part of the analysis— whether the fee bears the necessary relationship to the costs of regulation.

Because the environmental surcharge cannot properly be characterized as a service fee or a regulatory fee, we conclude that it is a tax. It is true, as the district court ruled, that monies from the surcharge "are used entirely for the purpose of dealing with the problems associated with storage of petroleum products." However, it would stretch the concept of a "service fee" or a "regulatory fee" beyond the breaking point if we were to hold that any surcharge or fee could satisfy the legal tests distinguishing such exactions from a tax simply because the revenues generated are spent in connection with the industry from which they are paid. Virtually any tax could be disguised as a fee under such reasoning.

We next address whether this tax is constitutional. There is no dispute that the State has the authority to levy a motor fuel tax, but it must spend any revenues so raised in accordance with the Utah Constitution. Article XIII, section 13 provides in pertinent part:

> [T]he proceeds from the imposition of any excise tax on gasoline or other liquid motor fuels used for propelling such vehicle ... shall be used *exclusively for highway purposes as follows:*
>
> (1) The construction, improvement, repair and maintenance of city streets, county roads, and state highways, including but not restricted to payment for property taken for or damaged by rights of way, and for administrative costs necessarily incurred for such purposes.
>
> (2) The administration of a driver education program.
>
> (3) The enforcement of state motor vehicle and traffic laws.
>
> (4) Tourists and publicity expense in any single biennium....

Utah Const. art. XIII, § 13 (emphasis added). The State does not even attempt to argue that Fund monies are being spent "exclusively for highway purposes" as that term is defined in the constitution. This is understandable, given the constitution's specific language, which was apparently designed to channel the expenditure of all motor fuel taxes into a very carefully selected set of programs, at least one of which, "Tourists and publicity expense," appears to bear a far less direct relationship to the highways of the state than the program challenged here, but none of which can be said to comprehend the risks of leakage from underground storage tanks used to store motor fuel. Therefore, we conclude that the surcharge is an unconstitutional tax, at least to the extent that it is levied on "gasoline or other liquid motor fuels used for propelling [any motor] vehicle."[16] *Id.*

Having determined that the environmental surcharge is, at least to the extent that it is levied on motor fuel, as defined in the consti-

---

**16.** Petroleum products subject to the surcharge include not only motor fuels, but also kerosene, solvents, jet fuels, and the like. *See* Utah State Tax Bulletin 9–90.

tution, an invalid tax, we now address the appropriate remedy. V–1 requests a refund of all monies it has paid and an injunction that would prohibit the State from collecting the surcharge in the future. The State argues that any remedy we fashion should be applied prospectively because a vast majority of UST owners and operators in Utah have relied on the Fund to meet EPA federal financial responsibility requirements. The State asserts that without the Fund, these owners and operators could be subject to large daily fines as a result of noncompliance with EPA regulations.

We have previously observed, "In fashioning an equitable remedy, reliance interests weigh heavily, and the court should seek a blend of what is necessary, what is fair, and what is workable." *Rio Algom Corp. v. San Juan County,* 681 P.2d 184, 196 (Utah 1984). In *Rio Algom,* we responded to such reliance interests by declaring a taxing statute prospectively unconstitutional, except as to the plaintiffs to whom we granted retroactive relief for the year for which they sought a refund. *Id.* We later were asked to address the application of the unconstitutionality holding to different litigants seeking a refund. We noted that the retroactive or prospective operation of a judicial decision "is not a question of judicial power but instead depends 'solely upon an appraisal of the relevant judicial policies to be advanced.'" *Kennecott Corp. v. State Tax Comm'n,* 862 P.2d 1348, 1352 (Utah 1993) (quoting *Van Dyke v. Chappell,* 818 P.2d 1023, 1025 (Utah 1991)). In making that determination,

> "we look to the impact retroactive application would have on those affected. When we conclude that there has been justifiable reliance on the prior state of the law or that the retroactive application of the new law may otherwise create an undue burden, the court may order that a decision apply only prospectively."

*Id.* (quoting *Van Dyke,* 818 P.2d at 1025). In *Kennecott,* we denied the refund because it would be contrary to the holding in *Rio Algom* and would place an undue and unexpected financial burden on the county to

grant a refund to the plaintiff and unknown others of taxes paid before the statute was declared unconstitutional. *Id.*

The same factors we identified in *Kennecott* are pertinent to the remedy appropriate here. In opposition to V–1's class action claims in the present case, the State submitted numerous affidavits from UST industry groups indicating their members' reliance on the Fund to meet EPA financial requirements. Many of these groups supported and were involved in establishing the environmental surcharge and the Fund. We think the record amply demonstrates reliance among those subjected to the surcharge and receiving the benefits of the program it finances, as well as the burdens that immediate and retroactive elimination of the surcharge, the Fund, and the program would work. We therefore hold that section 19–6–410 of the Utah Code, which imposes the surcharge and mandates that the revenues so generated be deposited into the Fund, violates article XIII, section 13 of the Utah Constitution to the extent that the surcharge is levied on motor fuels as defined in that section of the constitution. Our holding of unconstitutionality shall operate prospectively and shall be effective only from and after 61 days following the end of the 1997 legislative session. The delayed effective date is intended to provide reasonable time for the legislature, the Department, and UST owners and operators to determine whether the Fund can continue to provide adequate insurance and, if not, to make other arrangements for complying with the EPA rules.[17] *See Loyal Order of Moose, No. 259 v. County Bd. of Equalization of Salt Lake County,* 657 P.2d 257, 265 (Utah 1982).

Prospective application of our decision to V–1, the only party to this appeal, would have the potential of discouraging other litigants from challenging statutes of questionable validity. *Rio Algom,* 681 P.2d at 196. Indeed, we have said in the past that it would be unconscionable to deprive the litigant who has sustained the burden of attacking an unconstitutional statute of the fruits of victory. *Salt Lake City v. Ohms,* 881 P.2d 844,

---

17. We note that some of this work may be underway because under current law, the Fund will automatically sunset on July 1, 1998. Utah Code Ann. § 63–55–219.

854–55 (Utah 1994); *see also Labrum v. Utah State Bd. of Pardons,* 870 P.2d 902, 914 (Utah 1993). Therefore, as to V–1, our decision is retroactive to the year in which V–1 alleges it began to pay the surcharge, subject only to any applicable statutes of limitations and to the extent that V–1 can demonstrate that it paid the surcharge on motor fuels. *See Rio Algom,* 681 P.2d at 196.

We next address V–1's request for attorney fees pursuant to the Small Business Equal Access to Justice Act, Utah Code Ann. §§ 78–27a–1 to –6. To be entitled to litigation expenses under either section 78–27a–4 or –5, a party must satisfy the definitional requirements in section 78–27a–3 that it is a small business and has prevailed against the state. V–1 has satisfied the initial definitional requirement of prevailing against the State. However, no evidence is before this court indicating whether V–1 falls within the definition of a small business. Moreover, this case does not meet the additional requirements of either section 78–27a–4 or –5. To recover litigation expenses under section 78–27a–4, the small business must prevail in a "civil judicial action commenced by the state." Litigation expenses can be recovered under section 78–27a–5 only in a "civil judicial *appeal taken from an administrative decision* regarding a matter in which the administrative action was commenced by the state." (Emphasis added.) Neither requirement exists in this case, which is an action initiated by V–1 in district court seeking declaratory relief. In addition, both section 78–27a–4 and –5 add the requirement that "the court find[ ] that the state action was undertaken without substantial justification." We hold as a matter of law that the State has not acted without substantial justification in this case. Clearly, acting "without substantial justification" cannot be read so broadly as to encompass every case in which the state loses. Our decision today holding that the environmental surcharge is unconstitutional as applied to V–1 does not mean that the State has acted without substantial justification. In this case, the Tax Commission was required by the plain language of section 19–6–410 to collect from V–1 and others similarly situated. We can conceive of instances in which the state could be found to act without substantial justification. For instance, if a state agency arbitrarily interpreted a statute to the detriment of a small business, this abuse of the agency's power by exceeding its scope of discretion in interpreting a statute would support a finding that the state had acted "without substantial justification." The facts of this case do not support such a finding of an abuse of discretion; therefore, V–1 is also barred by the lack of a finding of state action "without substantial justification." This case is remanded to the district court for a determination of the amount of the surcharge V–1 has paid on motor fuels and entry of a judgment granting V–1 a refund. Furthermore, we hold that V–1 is not entitled to attorney fees pursuant to either section 78–27a–4 or –5.

HOWE, DURHAM and RUSSON, JJ., concur in Chief Justice ZIMMERMAN's opinion.

STEWART, Associate C.J., does not participate herein.

### On Petition for Rehearing

This court called for rehearing sua sponte in this case after issuing an opinion finding the environmental surcharge imposed by the Underground Storage Tank Act unconstitutional. *See V–1 Oil Co. v. Utah State Tax Comm'n,* 302 Utah Adv. Rep. 30, 34 (Oct. 29, 1996); *see also* Utah Code Ann. §§ 19–6–401 to –427. Our initial opinion held that the one-half-cent-per-gallon environmental surcharge imposed on petroleum delivered to underground storage tanks was a tax rather than a regulatory fee because V–1 Oil Company ("V–1") did not benefit from the Petroleum Storage Tank Fund ("Fund") created by section 19–6–409 of the Code. Having found this charge a tax, we held it unconstitutional because it violated article XIII, section 13 of the Utah Constitution, which provides that any excise tax on gasoline must be used exclusively for highway purposes. *V–1,* 302 Utah Adv. Rep. at 33–34; *see also* Utah Const. art. XIII, – 13.

▐ As noted, our holding on that first opinion was based primarily on the factual premise that V–1 did not benefit from the Fund because it was self-insured. *V–1,* 302

Utah Adv. Rep. at 33; *see also* Utah Code Ann. § 19–6–409. This led to our conclusion that the charge was not a fee, but a tax. In its brief rehearing, the Commission argues that V–1 actually does benefit from the Fund and that our factual assertion to the contrary in the initial opinion was erroneous.[1] If V–1 does benefit, then we must also address the second prong of the test for whether a regulatory fee is valid—whether such benefit is commensurate with the burden imposed by the environmental surcharge. *V–1*, 302 Utah Adv. Rep. at 32–33; *see also Walker v. Brigham City*, 856 P.2d 347, 349 (Utah 1993). If we find the environmental surcharge a valid fee, not a tax, then we must vacate the result in our prior opinion and affirm the trial court.

■ We first state the standard of review. Because V–1 appeals from the district court's grant of summary judgment dismissing its claims, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, V–1. *Harline v. Barker*, 912 P.2d 433, 435 (Utah 1996).

To the extent that our statement of facts in our prior opinion outlined the origins and general operation of the Fund, we will not restate them here. We hereby adopt that statement except to the extent it implies that the Fund would not pay to clean up a spill occurring at a tank owned by V–1. *See V–1*, 302 Utah Adv. Rep. at 30–31. Similarly, the analytical model for addressing whether the surcharge is a legitimate fee for service or a tax is also set out fully in our initial opinion. *Id.* at 32–33. We will not restate here.

Addressing the question of benefit, we find that V–1 does benefit from the Fund because a spill at one of its tanks would be covered by the Fund. The statute requires that V–1 have a certificate of compliance for each of its petroleum storage tank facilities. Utah Code Ann. § 19–6–412. The certificate was issued only after V–1 registered the tanks, paid the petroleum tank storage fee, complied with state and federal statutes, rules, and regulations, and submitted the results of tank tightness tests. *Id.* Once the certificate of compliance was issued, V–1 was eligible to recover costs covered by the Fund. *Id.* § 19–6–419. V–1 therefore benefits form the Fund because any costs above $10,000 incurred by V–1 in investigating, abating, or correcting any spill from its tanks would be eligible for reimbursement, subject to the other limitations of the act. *Id.*

V–1 argues that this benefit is illusory because, by the provisions of the statute, the State can turn around and recover from V–1 any costs paid by the Fund. Section 19–6–424.5 of the Utah Code does provide that the executive secretary of the Solid and Hazardous Waste Control Board ("the secretary"), "may ... take action ... to recover costs from responsible parties, including costs of any investigation, abatement, and corrective action." Utah Code Ann. § 19–6–424.5(1)(c). The Commission argues that this section simply allows the secretary to recover any costs the Fund expends in excess of the $1,000,000 limit or to recover the first $10,000 for which owners remain liable of the Fund expends monies to clean up a spill.

■ Here, as in other cases, "[w]hen faced with a question of statutory construction, we look first to the plain language of the statute." *CIG Exploration, Inc. v. Utah State Tax Comm'n*, 897 P.2d 1214, 1216 (Utah 1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 699, 133 L.Ed.2d 656 (1996). Under our rules of statutory construction, we need not look beyond the plain language of this provision unless we find some ambiguity in it. *Schurtz v. BMW of North Am., Inc.*, 814

---

1. Our initial opinion's finding that V–1 did not benefit from the Fund was based upon concessions made by the Commission's counsel. During the trial court proceedings, the Commission moved to dismiss V–1's class action suit, claiming that V–1 was not a member of the class it claimed to represent. In making that argument, the Commission pointed out that V–1 "does not rely on the fund for insurance.... V–1 chooses to self-insure and does no[t] benefit from the

fund." Further, at oral argument on the Commission's motion to dismiss the class action, counsel for the Commission stated, "V–1 ... self insure[s] and they don't benefit from the Environmental Surcharge and the Petroleum Storage Tank Fund."

Our discovery after issuance of the initial opinion that, in fact, V–1 may benefit from the Fund is what prompted us to call sua sponte for rehearing of this case.

P.2d 1108, 1112 (Utah 1991). In analyzing a statute's plain language, we must attempt to give each part of the provision a relevant and independent meaning so as to give effect to all of its terms. *Id.* If we find the provision ambiguous, however, we then seek guidance from the legislative history and relevant policy considerations. *World Peace Movement of Am. v. Newspaper Agency Corp.*, 879 P.2d 253, 259 (Utah 1994). In addition, "if doubt or uncertainty exists as to the meaning or application of an act's provisions, the court should analyze the act in its entirety and harmonize its provisions in accordance with the legislative intent and purpose." *Beynon v. St. George–Dixie Lodge #1743*, 854 P.2d 513, 518 (Utah) (quoting *Osuala v. Aetna Life & Casualty*, 608 P.2d 242, 243 (Utah 1980)), *cert. denied*, 510 U.S. 869, 114 S.Ct. 195, 126 L.Ed.2d 153 (1993).

When we look to the statute as a whole, it is clear that the Fund will pay $990,000 to clean up a spill, with the owner being responsible for the first $10,000 and any costs over $1,000,000. *See* Utah Code Ann. § 19–6–419.[2] In that context, section –424.5, allowing the secretary to recover the costs from owners, must be read as providing the secretary the authority to take legal action to recover costs in the limited situations where the Fund has paid to clean up a spill and the owner has not covered the first $10,000, where the Fund has paid more than the $990,000 authorized under section –419, or where the Fund has paid to clean up a spill and the owner is not covered because it lacks a compliance certificate. Reading the section, as V–1 does, to allow the secretary to recover costs paid out under section –419, renders the Statute incomprehensible. Such a reading would mean that an owner could spend $1,000,000 to clean up a spill, recover $990,000 of that cost from the Fund under section –419, and then face a suit from the secretary to recover the same $990,000 in costs that the Fund just paid to the owner. Such a reading is absurd.

We find further support for our reading of the statute in section –424.5, which also provides that the secretary may apportion liability among responsible parties and then gives factors to consider in such apportionments. Utah Code Ann. § 19–6–424.5(2). The use of "liability" in this section must refer to the proportion of costs for which an owner remains liable, i.e., the first $10,000 of costs or any costs over $1,000,000 for a covered owner, and all costs for a noncovered owner. Therefore, we find that V–1 does benefit from the Fund because its compliance certificates render it eligible for coverage.

The determination that V–1 benefits from the Fund is only the first prong in deciding whether the environmental surcharge is a fee or a tax. We must now consider whether the surcharge bears some reasonable relationship to the cost of the benefit said to justify its imposition. *V–1*, 302 Utah Adv. Rep. at 32–33; *Utah Restaurant Ass'n v. Davis County Bd. of Health*, 709 P.2d 1159, 1164 (Utah 1985). We note that fixing the amount of a fee is a legislative act to which we grant great deference. *See, e.g., Walker*, 856 P.2d at 349; *Banberry Dev. Corp. v. South Jordan City*, 631 P.2d 899, 904 (Utah 1981). Such fees are presumed reasonable, and the burden is on the party challenging the fee to prove that the fee is unreasonable. *Walker*, 856 P.2d at 349; *Banberry*, 631 P.2d at 904. Here, V–1 has failed to meet its burden of proving that the environmental surcharge is unreasonable.

V–1 claims that the environmental surcharge is unreasonable because to date the Fund it establishes has taken in more money from the fees than it has paid out in cleanup costs. This fact alone does not, however, establish that the fee is unreasonable. We have held that a fee may exceed the cost of providing intended service and remain reasonable. *See Walker*, 856 P.2d at 350. Fee-setting bodies are entitled to flexibility in their legislative solutions to problems. *Banberry*, 631 P.2d at 904. The problems they address are "not susceptible of exact measurement." *Id.* such bodies must also have

---

2. Such payments can occur in one of two ways. First, the Fund may reimburse an owner for the costs the owner has incurred in abating and correcting a spill. *Id.* § 19–6–420(3), (5)(c). Second, the Fund may pay directly to investigate, abate, and correct a spill. *Id.* § 19–6–420(2)(b)(i).

the power to deal creatively with the problems they encounter. *Id.* Absent any proof that the fee is unreasonable in its relationship to the benefits that V–1 receives from the Fund, we hold that the environmental surcharge established by section 19–6–410 is a valid, constitutional fee.

We vacate the ruling of our prior decision, affirm the trial court, and hold the environmental surcharge constitutional.

STEWART, C.J., and HOWE, DURHAM and RUSSON, JJ., concur in Chief Justice ZIMMERMAN's opinion.