**2023 UT 2**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

UTAH SAGE, INC., DBA HOBBY TRACTORS & EQUIPMENT, LARKIN
TIRES, INC., GARY LARSON, AND FRATERNAL ORDER OF EAGLES
#3372,
*Appellees and Cross-appellants*,

*v.*

PLEASANT GROVE CITY,
*Appellant and Cross-appellee*.

No. 20200290
Heard March 14, 2022
Filed February 23, 2023

On Direct Appeal

Fourth District, Spanish Fork
The Honorable Jared Eldridge
No. 190300164

Attorneys:

Gerald M. Salcido, Sandy, for appellees and cross-appellants

Robert C. Keller, Nathanael J. Mitchell, Salt Lake City, for
appellant and cross-appellee

JUSTICE PETERSEN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE PEARCE, JUSTICE
HAGEN, and JUSTICE POHLMAN joined.

Due to their retirements, JUSTICE HIMONAS and JUSTICE LEE did not
participate herein; JUSTICE DIANA HAGEN and JUSTICE JILL M.
POHLMAN[*] sat.

JUSTICE PETERSEN, opinion of the Court:

---

[*] JUSTICE HAGEN and JUSTICE POHLMAN became members of the
Court on May 18, 2022 and August 17, 2022, respectively. Both sat
as visiting judges prior to their confirmations.

### INTRODUCTION

¶1 Pleasant Grove (City) enacted a three-tiered "Transportation Utility Fee" (TUF), under which local property owners would be charged a monthly fee corresponding to the "intensity" with which they used city roads, as determined by a study of user demand on the City's roadways. The funds generated were to be used only to repair and maintain city roadways.

¶2 The question before us is whether the City had the authority to enact the TUF. If so, we must then determine whether the City properly characterized the TUF as a fee, or if it is really a tax for which the City was required to follow specific enactment procedures that were not observed here.

¶3 We conclude that the City acted within its broad authority to provide for the public's safety and welfare when it enacted the TUF. And we determine that the purpose of the TUF is characteristic of a fee because it is a specific charge for a specific service. The TUF charges local property owners for their use of city roadways, and the funds generated by the fee may be used only to compensate the City for the repair and maintenance of those roadways.

¶4 Accordingly, we affirm the district court's decision that the City had the power to enact the TUF, but we reverse its ruling that the TUF was actually a tax. However, this may not be the end of the analysis. Because the district court concluded that the TUF was a tax based on its purpose, it did not address an additional issue that is relevant to the TUF's status as a fee—its reasonableness. On that issue, we remand to the district court for it to first determine whether the Plaintiffs have waived a claim that the fee is unreasonable. If the court concludes that they have not, then it should address that question in the first instance.

### BACKGROUND

¶5 In the mid-2000s, the roads in the City were rapidly deteriorating. The City commissioned an engineering study, which determined that 41 percent of its roads were in "fair to poor" condition and would soon be in a "very poor to failing state." After various failed attempts to secure funding for the needed road repairs, the City adopted Ordinance 2018-19 and

Resolution 2018-45, which together established a Transportation Utility Fee.[1]

¶6 The TUF had two important characteristics. First, residential and commercial property owners would be charged a monthly fee based on their "intensity of use of the city streets." To gauge intensity of road usage, the City commissioned a study that analyzed "user demand" on city roads by measuring "the amount of traffic a residence or commercial business would generate" during "a specific time window." Using the study's findings "as a backbone," the City divided property owners into three categories: tier 1 businesses, tier 2 businesses, and residential. Tier 2 businesses "ha[d] the highe[st] intensity of [road] use," and were to be charged $236.05 per month. These businesses included gas stations/convenience stores, restaurants with drive-thru service, and businesses with more than 250 parking stalls. All other businesses were placed in tier 1 and were to be charged $41.27 per month. Finally, residential property owners were to be charged $8.45 per month.

¶7 Second, the funds generated by the TUF were to be kept separate from the City's general fund, and they could be used only for the repair and maintenance of city roadways. Specifically, both the Ordinance and Resolution mandated that "[a]ll transportation utility charges [would] be deposited in the Transportation Utility Revenue Fund and [would] not be commingled with or transferred to other city funds, including but not limited to, the general fund." The funds were to be used only for "the costs of maintenance and repair of the city street network, including engineering fees." And they explicitly could not be used for "general fund expenditures that do not relate to road maintenance and repair."

¶8 After the City passed the TUF, a city resident and several commercial property owners (Property Owners) sued the City to block implementation of the fee. The parties ultimately filed cross-

_____

[1] Ordinance 2018-19 and Resolution 2018-45 amended Ordinance 2018-10 and Resolution 2018-021, which established a TUF "based on the average peak day adjusted trips for each type of business." Under Ordinance 2018-19 and Resolution 2018-45, the City divided commercial businesses into two tiers "based upon the intensity of use for the business type." Only Ordinance 2018-19 and Resolution 2018-45 are at issue in this appeal.

motions for summary judgment. The Property Owners argued that the City lacked authority to enact the TUF because a "transportation utility" is not specifically authorized in the Municipal Code. And they argued in the alternative that the TUF was not really a fee, but was a tax for which the City had not followed the proper enactment procedures.

¶9    In ruling on the first issue, the district court concluded that Utah Code section 10-8-84, the General Welfare Statute, gave "the City broad authority to pass ordinances which are reasonably and appropriately related to the objectives of providing for the public safety, health, morals, and welfare." And the court concluded that this "broad authority includes authority to create a transportation utility and implement a fee or tax."

¶10 But with respect to the second issue, the district court found in favor of the Property Owners, determining that the TUF constituted a tax rather than a fee. The court looked to our precedent holding that a service fee is "a specific charge in return for a specific benefit to the one paying the fee." (Citing *V-1 Oil Co. v. Utah State Tax Comm'n*, 942 P.2d 906, 911 (Utah 1996), *vacated in part on other grounds*, 942 P.2d 915 (Utah 1997).) And it concluded that because the benefits of the TUF would accrue not only "to the individual property owners in the City but also to anybody who happens to use the City's road system whether they are a city resident or not," it could not "conclude there [was] a 'specific benefit' that returns to those who pay the fee." Thus, the court concluded that the TUF was a general benefit that "benefit[ted] the public at large," and was therefore a tax.

¶11 The Property Owners appeal the district court's determination that the City had the authority to enact the TUF. And the City appeals the district court's conclusion that the TUF is a tax. We exercise jurisdiction under Utah Code section 78A-3-102(3)(j).

**STANDARD OF REVIEW**

¶12  "In reviewing the trial court's decision to grant summary judgment, we give the court's legal decisions no deference, reviewing for correctness, while reviewing the facts and inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Dairy Prod. Servs., Inc. v. City of Wellsville*, 2000 UT 81 ¶ 15, 13 P.3d 581 (citation omitted).

## ANALYSIS

¶13 We first address the Property Owners' argument that the City had no authority to enact the TUF. We conclude that it did, and we affirm the district court on this point.

¶14 We then assess the City's argument that the district court was wrong in concluding that the TUF is really a tax. We agree with the City, and we reverse this ruling of the district court.

### I. THE CITY HAD AUTHORITY TO ENACT THE TUF

¶15 The Property Owners argue that the district court erred when it concluded the City had the authority to enact the TUF. The district court ruled that under Utah Code section 10-8-84, the Municipal Code's General Welfare Statute (sometimes referred to in caselaw as the "general welfare clause"), the City had ample authority to enact a user fee to fund road maintenance.

¶16 We agree with the district court. The Legislature has "conferred upon cities and counties the authority to enact all necessary measures to promote the general health, safety, morals, and welfare of their citizens." *State v. Hutchinson*, 624 P.2d 1116, 1118 (Utah 1980). The General Welfare Statute allows municipalities to

> pass all ordinances and rules, and make all regulations, not repugnant to law, necessary for carrying into effect or discharging all powers and duties conferred by this chapter, and as are necessary and proper to provide for the safety and preserve the health, and promote the prosperity, improve the morals, peace and good order, comfort, and convenience of the city and its inhabitants, and for the protection of property in the city.

UTAH CODE § 10-8-84(1).

¶17 We have explained that the General Welfare Statute grants municipalities such as the City two distinct types of power: first, "power is given to implement specific grants of authority"; second, municipalities are given "an independent source of power to act for the general welfare of [their] citizens."[2] *Hutchinson*,

---

[2] *Hutchinson* involved a statute identical to the General Welfare Statute that applied to counties rather than cities, but that does

(continued . . .)

624 P.2d at 1122. In other words, the General Welfare Statute grants local governments "independent authority apart from, and in addition to, specific grants of authority to pass ordinances which are reasonably and appropriately related to the objectives of that power, i.e., providing for the public safety, health, morals, and welfare." *Id.* at 1126 (citation omitted). And we have "expressly abandon[ed]" any requirement that municipal powers be strictly construed, *id.* at 1119 n.3, deeming such a rule to be "antithetical to effective and efficient local and state government." *Id.* at 1126.

¶18 Repairing streets that are in poor condition—and are headed toward a "very poor to failing state"—unquestionably falls within a municipality's general power to provide for the public safety and welfare. And "[w]e generally give latitude to local governments in creating solutions to problems, especially in meeting the challenges and needs caused by accelerated urban growth." *Bd. of Educ. of Jordan Sch. Dist. v. Sandy City Corp.*, 2004 UT 37, ¶ 31, 94 P.3d 234 (citations omitted).

¶19 The Property Owners do not dispute that the City has authority to repair and maintain city roadways. Rather, they argue that the City lacks authority to charge a transportation utility fee to fund these services. In support of this argument, they point to another provision of the Municipal Code that involves utilities but does not specifically refer to a transportation utility. Utah Code section 10-8-14, titled in relevant part "Utility and telecommunications services," states that a municipality may "construct, maintain, and operate waterworks, sewer collection, sewer treatment systems, gas works, electric light works, telecommunications lines, cable television lines, public transportation systems, or public telecommunications service facilities." UTAH CODE § 10-8-14(2)(a). The Property Owners reason that because a transportation utility is not listed in this provision, the City is not allowed to establish one. And consequently, they reason that the City is not permitted to charge a fee to support a transportation utility.

¶20 The Property Owners rely upon language from *Hutchinson*, where we stated that "[s]pecific grants of authority may serve to limit the means available under the general welfare

---

not change our analysis. *State v. Hutchinson,* 624 P.2d 1116 (Utah 1980) (analyzing UTAH CODE § 17-5-77).

clause." 624 P.2d at 1126. For example, in *Harding v. Alpine City*, 656 P.2d 985 (Utah 1982) (per curiam), we concluded that Alpine City could not require all buildings within 500 feet of a city sewer line to connect to the line because a different statute permitted cities to require this only of buildings within 300 feet of a sewer line. *Id.* at 985–86. We reasoned that "if the City were permitted to reach beyond 300 feet[,] the words '300 feet' in the statute would have no meaning." *Id.*

¶21 But although we acknowledged that specific grants of authority might have such a limiting effect, the thrust of *Hutchinson* went in the opposite direction. The key principle established in that case was that the Legislature's grant of general welfare power to local governments provides them with "independent authority apart from, and in addition to, specific grants of authority to pass ordinances which are reasonably and appropriately related to the objectives of that power." *Hutchinson*, 624 P.2d at 1126 (citation omitted). And we cautioned that specific grants of authority "should generally be construed with reasonable latitude in light of the broad language of the general welfare clause which may supplement the power found in a specific delegation." *Id.*

¶22 Here, the Property Owners do not explain why the utilities identified in section 10-8-14 should be read as an exhaustive list that prevents the City from establishing a different type of utility and charging a fee to fund it. The Property Owners do not point to any language in this provision that prohibits cities from establishing a utility not listed there. And they do not provide any legal analysis as to why this statute should be read as an exception to the rule we announced in *Hutchinson* that cities have independent authority to act for the general welfare, and specific grants of authority "should generally be construed with reasonable latitude" because the General Welfare Statute "may supplement the power found in a specific delegation." *Id.* Accordingly, the Property Owners have not persuaded us that section 10-8-14 prevents the City from enacting the TUF.

¶23 The Property Owners also argue that a definition of "utility" found in the Uniform Fiscal Procedures Act for Utah Cities prohibits the City from establishing a transportation utility. That Act defines a "utility," for purposes of that chapter only, as "a utility owned by a city, in whole or in part, that provides electricity, gas, water, or sewer, or any combination of them." UTAH CODE § 10-6-106(24).

¶24 But this argument fails for the same reasons. The Property Owners do not identify any language in the definition purporting to create an exhaustive list of the utilities a city is allowed to establish.

¶25 The Property Owners also contend that their argument is supported by two statutes in other titles of the Utah Code that define "public utility," which also do not list a transportation utility.[3] But the Property Owners do not explain why these definitions of a "public utility" are relevant here.

_____

[3] The Property Owners reference two definitions of "public utility." The first is in Title 54, titled "Public Utilities." There, "public utility" is defined as

> includ[ing] every railroad corporation, gas corporation, electrical corporation, distribution electrical cooperative, wholesale electrical cooperative, telephone corporation, telegraph corporation, water corporation, sewerage corporation, heat corporation, and independent energy producer not described in Section 54-2-201 where the service is performed for, or the commodity delivered to, the public generally, or in the case of a gas corporation or electrical corporation where the gas or electricity is sold or furnished to any member or consumers within the state for domestic, commercial, or industrial use.

UTAH CODE § 54-2-1(23)(a). The second is in Title 59, titled "Revenue and Taxation," which states that

> "Public utility" means: (a) for purposes of this chapter, the operating property of a railroad, gas corporation, oil or gas transportation or pipeline company, coal slurry pipeline company, electrical corporation, telephone corporation, sewerage corporation, or heat corporation where the company performs the service for, or delivers the commodity to, the public generally or companies serving the public generally, or in the case of a gas corporation or an electrical corporation, where the gas or electricity is sold or furnished to any member or consumers within the state for domestic, commercial, or industrial use.

(continued . . .)

¶26 Finally, the Property Owners note that the Legislature has given municipalities authority to levy special taxes for specific purposes, like road maintenance. But the Property Owners make no argument as to why the availability of this funding mechanism prevents the City from enacting a different funding mechanism (the TUF).

¶27 Accordingly, the Property Owners have not persuaded us that the district court erred in concluding that the City had authority to enact the TUF.

## II. THE TUF IS PROPERLY CHARACTERIZED AS A SERVICE FEE

¶28 We now address the City's argument that the district court erred in holding that the TUF was a tax rather than a fee. The district court concluded that the TUF should be deemed a tax because "the benefit of an improved road system[] is a general benefit rather than a specific benefit to those who pay the fees." The City argues that the court's focus on whether others benefitted from the fee in addition to the fee payers was incorrect. To date, we have not specifically addressed whether a transportation utility fee should be considered a fee or a tax.

¶29 As we will explain, we conclude that the purpose of the TUF qualifies it as a service fee because it is a specific charge for a specific service—the use of the City's roads. We recognize that there are surely others who use the City's roads but do not pay the TUF, such as a visitor from out of town who drives through the City and purchases a meal at a drive-thru restaurant. However, this fact on its own does not transform the TUF into a general revenue-raising measure or otherwise nullify the TUF's status as a fee.

¶30 In the primary case analyzing the distinction between taxes and fees, *V-1 Oil Co. v. Utah State Tax Comm'n*, we explained that there is no "bright line test for distinguishing a tax from a fee." 942 P.2d 906, 911 (Utah 1996), *vacated in part on other grounds*, 942 P.2d 915 (Utah 1997). "Rather, [h]ow such exactions should be

_____

*Id.* § 59-2-102(30)(a) (2018). While the definition in section 59-2-102(30)(a) has been amended since 2018, we quote the 2018 version that the Property Owners relied upon in their briefing. And we note that none of the recent amendments affect our analysis.

classified depends upon their purpose." *Id.* (alteration in original) (citation omitted) (internal quotation marks omitted). "[A] tax raises revenue for general governmental purposes . . . ." *Id.* (citations omitted). In contrast, we described two types of fees: a "service fee," which "raises revenue . . . to compensate the government for the provision of a specific service or benefit to the one paying the fee"; and a "regulatory fee," which defrays the cost of regulating the fee payer. *Id.* (citations omitted). If a charge does not fit into one of these fee categories, then "it is a general revenue-raising measure and must be classified as a tax." *Id.*

¶31 Where the purpose of a government exaction indicates that it is a fee, we next consider whether the fee is "reasonable" — in other words, whether the charge "bears some reasonable relationship to the cost of the benefit [or service] said to justify its imposition." *Id.* at 917 (citations omitted). "To be a legitimate fee for service, the amount charged must bear a reasonable relationship to the services provided, the benefits received, or a need created by those who must actually pay the fee." *Id.* at 911. We have explained that "[t]his requirement is intended to prevent a fee from being used to generate excessive revenues and becoming indistinguishable from a tax." *Id.* (citation omitted).

¶32 In sum, the first step in determining the nature of a government exaction is to consider its purpose and determine whether it is characteristic of a service fee, a regulatory fee, or a general revenue-raising tax. If the purpose is characteristic of a fee, we then consider whether the fee is reasonable. If it is, then the exaction is a legitimate fee.

¶33 Applying these principles here, we conclude that the purpose of the TUF is characteristic of a service fee. As an initial matter, neither party contends that the TUF is a regulatory fee. So the only question before us is whether the TUF is a service fee — in other words, whether it is a "specific charge" for a "specific service or benefit." *Id.*

¶34 And we conclude that the TUF is a specific charge for a specific service that the City provides to those who pay the TUF. The purpose of the TUF is to generate funds for the repair and maintenance of city roads by charging a three-tiered fee that correlates with the fee payer's "intensity of use" of those roads (as determined by the user demand study).

¶35 Accordingly, the TUF relates to a specific service: the use of City roadways. The district court characterized the service provided a bit differently, as "the benefit of an improved road

system[]." And we do not disagree that it is likely that the result of the TUF would be better roads. But we conclude it is more accurate to characterize the TUF as a charge for the use of city roads. The City set the TUF fee schedule based on the demand that City residents and commercial property owners place on the roadways. The user demand study quantified the "intensity of use" of city roads by residents and various types of commercial businesses. The City then established a three-tiered fee schedule accordingly. Thus, the TUF is designed to charge residents and commercial business owners an amount that generally corresponds to their use of the roads and the additional traffic they generate, such as trips made by customers to and from a business.

¶36 And the TUF constitutes a "specific charge" to "compensate" the City for this specific service (the use of its roads). *See id.* (explaining that a service fee "raises revenue . . . to compensate the government for the provision of a specific service or benefit to the one paying the fee"). The funds generated by the TUF may be used only to compensate the City for the repair and maintenance of its roadways. By the express terms of both the Ordinance and Resolution, "[a]ll transportation utility charges shall be deposited in the Transportation Utility Revenue Fund and shall not be commingled with or transferred to other city funds, including, but not limited to, the general fund." Moreover, "[t]he funds deposited may only be used for the costs of maintenance and repair of the city street network, including engineering fees, but may not be used for general fund expenditures that do not relate to road maintenance and repair." Accordingly, the TUF is a targeted charge to compensate the City for the wear-and-tear caused by the use of its roadways, and not a "general revenue-raising measure." *Id.*

¶37 Thus, we conclude that the purpose of the TUF qualifies it as a service fee because it is a specific charge for a specific service. Local property owners who use the City's roads most intensely pay a fee amount that is commensurate with their use. And the City may spend the funds generated by the fee only for the improvement and maintenance of those roads.

¶38 However, the district court concluded that the TUF was not a service fee because the service provided would benefit not only the fee payers but also the general public. The court reasoned that "the benefit of an improved road system[] is a general benefit rather than a specific benefit to those who pay the fees" because

"[t]he benefit not only accrues to the individual property owners in the City but also to anybody who happens to use the City's road system." Therefore, it reasoned that it could not "conclude there is a 'specific benefit' that returns to those who pay the fee," but that "the benefit is general in nature benefitting the public at large." On this basis, the court determined that the TUF must therefore be deemed a tax.

¶39   As we explained above, the service provided by the City is better characterized as use of City roads rather than improved roadways in general. But this distinction does not directly answer the point made by the district court. Whether the TUF is a charge for the use of City roadways, or a charge for the benefit of driving on improved roadways, the district court was correct in observing that some non-fee-payers will drive upon the City's improved roads.

¶40   But the fact that some people who do not pay the fee may benefit from it does not necessarily transform the fee into a tax. For example, in *V-1 Oil*, we did not analyze whether others might have benefited from the environmental surcharge at issue. We asked only whether V-1 Oil benefitted from the surcharge. *Id.* at 916.

¶41   The threshold question in separating a service fee from a general revenue-raising tax is whether the fee compensates the City for a particular service or benefit that it provides (here, the use of its roads), and whether those who pay the fee (here, City residential and commercial property owners) receive that particular service or benefit. *See id.* at 911, 917 (describing "the first prong" of the test for whether a charge is a fee or tax as whether the payer benefits from paying the charge at issue).

¶42   Such is the case here. The City has structured the TUF so that the fee is charged in proportion to its findings about how much residential and commercial property owners use the roadways. This "use" includes not only individual trips upon the roads, but also the demand that the property owners place upon the roads—for example, gas stations and drive-thru restaurants pay a larger fee because they draw customers who use City roads to reach them.

¶43   The City could have chosen to distribute the TUF differently. Taking our earlier example of the out-of-town visitor who drives through the City and purchases a meal at a drive-thru restaurant, the TUF compensates the City for the visitor's use of its roads through the exaction from the owner of the drive-thru

restaurant. Instead, the City could have devised a way to charge each vehicle that uses its roadways for each individual trip. In such a scenario, rather than the drive-thru restaurant owner paying the tier-3 fee, restaurant employees and customers would each pay for their individual trips to the restaurant. But the fact that the City did not structure the TUF in this manner does not make it a general revenue-raising measure. We will not second-guess the manner in which a local government chooses to apportion a service fee unless the manner indicates that the purpose of the fee is not to compensate the municipality for the provision of a specific service or benefit to fee payers, or the apportionment renders the fee unreasonable. Accordingly, we conclude that the purpose of the TUF is characteristic of a service fee.

¶44 But as we discussed in *V-1 Oil*, this does not end the inquiry. We then consider whether the fee is "reasonable"—in other words, whether the charge "bears some reasonable relationship to the cost of the benefit [or service] said to justify its imposition." *Id.* at 917 (citations omitted). "This requirement is intended to prevent a fee from being used to generate excessive revenues and becoming indistinguishable from a tax."[4] *Id.* at 911 (citation omitted). Accordingly, although the purpose of the TUF

_____

[4] In expounding upon this requirement, we have explained that "for a fee for service to be reasonable, the total cost of the service so financed must fall equitably upon those who are similarly situated and in a just proportion to the benefits conferred." *V-1 Oil Co. v. Utah State Tax Comm'n*, 942 P.2d 906, 911 (Utah 1996), *vacated in part on other grounds*, 942 P.2d 915 (Utah 1997). But "[w]e do not insist on exact mathematical precision." *Id.* As a practical matter, "[t]he nature of the service or benefit provided may . . . make it difficult or impossible to distribute the services or benefits equally to all who pay the fee." *Id.* at 911–12 (citation omitted). And a fee may be reasonable even if it raises revenue that exceeds the cost of the service. *Id.* at 911. Fundamentally, if the charge is not reasonably related to "some need created by the one paying the fee," or if the "services provided through the fee are not of demonstrable benefit to the one paying the fee," it is likely unreasonable and therefore illegitimate. *Id.* at 912 (citations omitted) (internal quotation marks omitted).

qualifies it as a service fee, if the TUF is unreasonable, it may lose that status.[5]

¶45 The Property Owners argue that the TUF is unreasonable. However, we note that because the district court concluded that the purpose of the TUF was characteristic of a tax, it did not consider the reasonability of the TUF. The City claims that the Property Owners should not be permitted to make such an argument now because they did not make it in the district court or present proof in support of such a claim. The Property Owners dispute this characterization.

¶46 In either event, because the district court did not reach this question, we do not resolve it here. Rather, we remand to the district court to determine whether the Property Owners sufficiently argued in their motion for summary judgment (or at some other time in the district court proceedings) that the TUF is unreasonable, or whether they waived the argument. If the argument was not waived, the district court should address it in the first instance.

## CONCLUSION

¶47 The district court properly concluded that the City was within its broad authority to enact the TUF, and we affirm that ruling. However, the court incorrectly determined that the TUF was a tax because it would benefit others beyond those paying the fee, so we reverse that ruling. We conclude that the purpose of the TUF qualifies it as a service fee. This leads to the second step of the analysis—whether the fee is reasonable. We remand to the district court for consideration of this issue in the first instance. If the district court determines that the Property Owners have waived an argument that the TUF is unreasonable, the TUF should be deemed a service fee. However, if they have not waived this claim, the district court should make its own determination as to whether the TUF is reasonable.

---

[5] Importantly, however, fees are presumed to be reasonable. *V-1 Oil*, 942 P.2d at 917. Cities "are entitled to flexibility in their legislative solutions to problems." *Id.* (citation omitted). The party challenging the fee bears the burden of proving it is unreasonable. *Id.* at 917–18. And "[a]bsent any proof that the fee is unreasonable" in relation to the benefits conferred upon the fee payer, that burden is not met. *Id.* at 918.

¶48 Accordingly, we affirm in part, reverse in part, and remand.

_____